## BERRY *v.* GARLAND &amp; *a.*

H. one of the original proprietors of Moultonborough, in 1771, " pitched " " one hundred acres at Red Hill Falls," and in 1806, conveyed one-third of his " pitch "to J. H., and two-thirds of it to W. . In 1807, the proprietors appointed a committee to survey and allot the common land, and to run out and locate the " pitches," and to appraise the same, &c.; and in 1809 the committee made a report, accompanied by a plan, which showed that H.'s " pitch " was surveyed by the committee to J. H. and W., in severalty, one-third, or thirty-three and one-third acres to J. H., and two-thirds or sixty-six and two-thirds acres to W. At the date of the survey, a portion of what was the original " pitch " of H. was covered by a pond of water, raised by an artificial dam, and the land surveyed to W. was bounded by the water's edge of said pond, at high-water mark, embracing sixty-six and two-thirds acres of land, exclusive of the land covered by the water, and the committee and said W. agreed upon that location of the share of W., and the line of the water's edge as the boundary, and W. went into possession of his share, claiming and possessing the same, according to the location and line so agreed upon, and assented thereto, and acquiesced therein for the space of about twenty-four years; it was *held* that said agreement, thus executed and acquiesced in, was conclusive evidence of the correctness of the location of the share of W., and of the accuracy of said boundary or divisional line between the proprietors and said W., and that said W. and his grantees were equally bound and concluded thereby.

Possession is sufficient evidence of title, under the plea of soil and freehold, or under the general issue, accompanied by a brief statement of soil and freehold in the defendant, pleaded in answer to an action of trespass *quare clausum fregit*, brought by one who has no trial.

TRESPASS, for breaking and entering the plaintiff's close, in Moultonborough, on the 16th day of July, 1846, and cutting and carrying away ten tons of the plaintiff's grass, &c.

The defendants pleaded the general issue, together with: a brief statement, alleging that the *locus in quo* was the soil and freehold of Samuel Emerson and John Coe, and that the defendants entered and did the acts complained of under a license from them.

It was admitted that the lands in question were originally a part of the common and undivided lands in the town of Moultonborough, and the proprietors' records showed that in 1791, one Nathan Hoit, as one of the original proprietors,

"pitched" one hundred acres at Red Hill Falls; that in 1870 the proprietors appointed a committee to survey and allot the common lands, and to run out and locate the "pitches," and to appraise the same, &c.; and that in 1809 the committee made a report, accompanied by a plan, which report was accepted.

Nathan Hoit, on the 9th day of July, 1806, had conveyed one-third of his "pitch" to Joseph Hoit, and on the 28th of October, 1806, conveyed the other two-thirds to one Asa Watson, and on the 8th day of November, 1809, said Nathan quitclaimed to the proprietors all his interest in the common lands. The plan, made and reported by the aforesaid committee, showed that Nathan Hoit's "pitch" was surveyed by the committee to Joseph Hoit and Asa Watson, in severalty, one-third or thirty-three and one-third acres to Hoit and sixty-six and two-thirds to Watson. The *locus in quo* was included in Nathan Hoit's original "pitch," and he having built mills at the falls, the water, when the dam was full, flowed the land in question, being flats, but the dam becoming broken down, the flats were left uncovered, and the grass cut by the defendants grew thereon.

Asa Watson testified that the committee bounded his lands upon the water's edge, as the pond then was, the flats being covered, and that he never claimed, or supposed that he owned or had any right to the flats in question, but that he had his sixty-six and two-thirds acres of land without the water.

But the plaintiff produced a deed from Watson to D. J. Smith, conveying to him his land, including, as the plaintiff contended, the flats, dated January 28, 1833.

But Watson testified that said deed was written by John A. Rollins, who made the contract with him as the agent of said Smith, and that he (Watson) did not read the deed, nor understand that the flats were conveyed therein, nor did he point out the boundaries of his land, or tell Rollins that he owned the flats. Smith conveyed the same premises to

Rollins, December 16, 1833, and Rollins and Nathaniel Chase conveyed the same to the plaintiff, August 29, 1842, which last conveyance was recorded July 25, 1845.

The evidence tended to show that the committee surveyed in severalty to Watson sixty-six and two-thirds acres of land, and to Joseph Hoit thirty-three and one-third acres, exclusive of the land covered by the water; and it appeared, by the proprietors' records, that they voted, March 17, 1810, to sell at auction all of their undivided and unlocated lands. And on the 31st of May, 1815, the proprietors voted to Ezekiel Hoit, Esq., all the common lands not drawn and voted to any other person, and all the gores, islands, points and nooks, not disposed of as aforesaid, he being the highest bidder, at $100; and it was admitted that Emerson and Coe are the owners of all the lands and rights thus acquired by the said Ezekiel Hoit.

The defendants also produced copies of the following described deeds, to wit, a mortgage from John A. Rollins to Elisha Hanson, dated July 1, 1836; also a mortgage from Nathaniel Chase to said Hanson, of the same date; also a quitclaim from Rollins to H. G. Hanson, the devisee of Elisha Hanson, deceased, dated August 29, 1842; also a quitclaim from Nathaniel Chase to the same, and of the same date; also a deed from the heirs of H. G. Hanson, deceased, to B. M. Mason, dated May 6, 1846, and from Mason to Emerson, of the same date, all conveying the same premises described in the mortgage from Rollins to E. Hanson.

The court instructed the jury that although Nathan Hoit's "pitch" did originally include the *locus in quo*, and his deed to Watson did convey to him two-thirds of the land in question, yet if the committee, in 1809, undertook to sever the lands of Joseph Hoit and Watson, and bounded Watson's land by high-water mark, and he agreed to the location, and took his proportion of the "pitch" in land without that covered by water, and all parties were then satisfied with that arrangement, then Watson was bounded by that

line, and so are his grantees, although he might afterwards convey the flats to Smith, and this plaintiff, as well as Watson, must be concluded by the line fixed by the committee and the parties in 1809.

The jury returned a verdict for the defendants, and the plaintiff excepted to the instructions of the court to the jury, and for that caused moved that the verdict be set aside and a new trial granted.

*Lyford*, for the plaintiff.

The plaintiff contends that the verdict in this case cannot stand.

1. The committee marked out the mill lot, which was Hoit's " pitch," in their survey and plan of the common land, and left nothing for the vote of 1815, to sell the gores, &c., to operate upon. The plan covers the premises in controversy, as a part of Hoit's " pitch."

2. Watson was not at liberty to say that he did not own the *locus in quo*, in contradiction of his deed.

3. The mortgage to Hanson does not cover the *locus in quo*, and does not legitimately belong in the case.

4. The defendants, making no title but under the vote of the proprietors of 1815, conveying all the common land not located, they are not entitled to judgment on the verdict.

*Hobbs*, for the defendants.

When Nathan Hoit " pitched " his hundred acres at Red Hill Falls, he did not claim it by metes and bounds. It remained to be located. October 28, 1806, he conveyed two-thirds to Asa Watson.

If, when the land was located by metes and bounds by the committee, in 1809, it was bounded by the shore of the pond at high-water mark, and that location was assented to by Watson and the proprietors, Watson, and all claiming under him, are bound by that location. *Gray* v. *Berry*, 9 N. H.

Berry v. Garland.

Rep. 473; *Sawyer* v. *Fellows*, 6 N. H. Rep. 107; *Prescott* v. *Hawkins & a.* 12 N. H. Rep. 19.

The jury have found that it was so bounded, and that location was assented to.

This case comes strictly within the principle of the case of *Lerned* v. *Morrill*, 2 N. H. Rep. 197, where the deed referred to the monuments not then, but afterwards, erected.

The court decided that the parties were bound by the monuments so erected. *Prop. Ken. Purchase* v. *Tiffany*, 1 Greenl. Rep. 219.

The case finds that Nathan Hoit, November 8, 1809, quitclaimed to the proprietors all his interest in the common land, so that whatever interest said Hoit had in the land " pitched " by him, situated between the land run out and bounded by the committee to Asa Watson, and the land so bounded to Joseph Hoit and covered by water, passed to said proprietors, including the *locus in quo.*

Asa Watson, then, had no title to or interest in the *locus in quo*, January 28, 1833, when he executed the deed to D. J. Smith, through whom the plaintiff claims.

The vote of the proprietors, passed May 6, 1815, voting to Ezekiel Hoit " all the common lands," &c., was sufficient to pass the same to him, including the *locus in quo. Coburn* v. *Ellenwood*, 4 N. H. Rep. 99, and cases cited.

The defendants were in possession, and the plaintiff must show title.

WOODS, J. This action is trespass *quare clausum fregit*, and the defence relied upon is the alleged ownership of the *locus in quo*, by Samuel Emerson and John Coe, by whose direction and authority the defendants did the acts of which complaint is made. It is not necessary for the proper determination of this cause, to decide whether the deed of Mason to Samuel Emerson conveyed to Emerson a valid title to the premises or not. And it is equally unnecessary to consider the effect of the votes of the proprietors, of the

17th of March, 1810, and the 31st of May, 1815, as constituting a conveyance of the *locus in quo* to Ezekiel Hoit, or of his deed to Emerson and Coe, of all the right acquired by virtue of said votes. Whatever right the plaintiff had was derived from Asa Watson, through sundry mesne conveyances, namely, a deed from Watson to Smith, and from Smith to Rollins, and from Rollins and Chase to the plaintiff.

Mason's title, such as it was, was derived from Watson, through sundry deeds, namely, a deed from Watson to said Smith, and a deed from said Smith to said Rollins, and deeds of mortgage from said Robbins and Chase to Elisha Hanson, and quitclaim deeds from Rollins and Chase to H. G. Hanson, the devisee of Elisha Hanson, and a deed from the heirs of H. G. Hanson to Mason.

Questions of more or less difficulty might be found to arise in reference to the priority of right and title of the parties, in virtue of the two chains of title thus stated, dependent upon the time of the records of the several deeds, and other circumstances affecting that question.

The verdict, however, was not returned upon the ground of the validity of the title of Emerson, acquired under the deed of Mason, or of that of Emerson and Coe, derived from Ezekiel Hoit; but upon the ground that Watson, a prior grantor of the plaintiff, had no title in the premises at the date of his deed to Smith, namely, January 28, 1833.

The admitted possession of Emerson and Coe was a sufficient title in them to warrant the defendants in setting up the defence upon which they rely, unless the plaintiff has shown a better title.

Actual possession is a sufficient title to enable a party to maintain an action of trespass against a mere wrong doer, and it is equally available as a defence against a charge of the same character by one who has no title whatever to the estate in question.

The verdict in the present case finds, in effect, that the

plaintiff has no valid title to the *locus in quo.*  It was strictly
upon that ground that the verdict was returned in favor of
the defendant.  As the basis of that finding, the jury must
have found, and did find that Asa Watson, from whom the
plaintiff derived whatever of title he may have to any part
of the " pitch " of Nathan Hoit, of which " pitch " the *locus
in quo* was a part, acquired no title to the *locus in quo,* by
virtue of the deed of Hoit to him of October 28, 1806, and
the location of the land by the committee in 1809, and, con-
sequently, had no title thereto at the date of his deed to
Smith, of January 28, 1833.

The court instructed the jury " that although Nathan
Hoit's ' pitch ' did originally include the *locus in ‾quo,* and
his deed to Watson did convey to him two-thirds of the
land in question, yet if the committee, in 1809, undertook
to sever the lands of Joseph Hoit and Watson from the
lands of the proprietors, and bounded Watson by the waters
of the pond at high-water mark, and Watson agreed to the
location, and took his proportion of the " pitch " without
that portion covered by the water, and all the parties were
there satisfied with the arrangement, then Watson was
bound by that line, and so were his grantees ; and although
Watson might afterwards convey the flats to Smith and
this plaintiff, nevertheless both Smith and the plaintiff, as ₒ
well as Watson, were concluded by the line fixed by the
committee and the parties in 1809."

The question is, was that instruction warranted by the
state of facts shown by this case, and the settled principles
of law applicable to the question under consideration.

Nathan Hoit, as one of the original proprietors of Moul-
tonborough " pitched " one hundred acres at " Red Hill
Falls."  The case shows no other designation of the partic-
ular tract constituting the " pitch."  It was " one hundred
acres at ' Red Hill Falls.' "  The boundaries were, of course
and of necessity, to be fixed and determined in some way
thereafter.

Before the " pitch " was located, Nathan Hoit conveyed two-thirds of the " pitch " to Asa Watson, and one-third of it to J. Hoit, in 1806. In 1807, the proprietors appointed a committee " to run out and locate the ' pitches,' and that committee, in 1809, made a report, accompanied by a plan, which was accepted by the proprietors, by which it appeared that one-third, or thirty-three and one-third acres of the Nathan Hoit ' pitch' had been set off in severalty to J. Hoit, and two-thirds, or sixty-six and two-thirds acres of it to Asa Watson, and that the *locus in quo* was not embraced therein."

At the date of the survey and location of the ' pitch,' and of the assignment of their several shares of it to Hoyt and Watson, the *locus in quo* was covered by a pond of water, raised by an artificial dam, for the purpose of operating certain mills located at " Red Hill Falls," and the share of Watson was bounded by the water's edge, as the pond then was; and Watson testified " that he never claimed or supposed that he owned or had any right to the flats in question, but that he had his sixty-six and two-thirds acres of land without the water." And it may well be here observed that this was the extent of the claim of title made by Watson, from the date of said location, in 1809, to the period of ∙his conveyance to Smith, of January 28th, 1833, in virtue of which the *locus in quo* is claimed by the plaintiff. And it may also be observed that inasmuch as Nathan Hoit conveyed, by his deed to J. Hoit, one-third of his " pitch," and to Asa Watson two-thirds of it, that there was no remainder vesting in him subsequently to those conveyances.

The parties, then, interested in the location of the " pitch," and the determination of its extent and boundaries, were none other than the proprietors of Moultonborough and J. Hoit and Asa Watson. And by the finding of the jury it is fully determined that the tract of land set off to Watson was bounded at the pond by the line of high-water mark,

and that the same line of location was agreed to by the parties interested therein.

The case finds that the *locus in quo* was, in fact, included in the " pitch," but nevertheless, the conveyance of all his interest in the lands by Nathan Hoit, left all the interest in the lands in J. Hoyt and Watson and the proprietors, to be adjusted by them, and their extent ·and limits to be determined by them ; and their interests must be in accordance with the result of that adjustment.   No rights would result to Nathan Hoit from the settlement of the parties above interested.   Even if N. Hoit conveyed rights which his grantees may have abandoned or otherwise lost, he can in no way set up ·title thereto, nor can the plaintiff do it in his behalf.

It is apparent, from this view of the case, that the extent and limits of the rights conveyed must, from the very nature of the case, be ascertained and adjusted in some way by the parties interested, and who did undertake to effect that object. And if, upon a proper adjustment, any portion of the land, originally included in the " pitch," should be excluded legally and properly, it would remain, we think, to the proprietors in the same manner in which it would, if its location had been fixed by the proprietors and N. Hoit, before his conveyances to J. Hoit and Watson.

Upon the facts of this case and the charge of the court, the question for the consideration of the jury related solely to the true locality of the divisional line between the land of the original proprietors and that portion of the " pitch " of N. Hoit, conveyed by him to Watson, and that was made to depend upon their finding as to the agreement of the proprietors and Watson in reference thereto.   The charge was to the effect that the agreement, if made, was binding upon the parties, and concluded them and their subsequent grantees as to the extent of their adjoining possessions, and the line between them.   Was the charge correct ?

It is now a well settled rule of law in this State,

that when the owners of adjoining lands agree, by parol, upon the location of the divisional line between them, such agreement, followed by the possession of the parties in accordance with the line agreed upon, will afford conclusive evidence of the extent of their respective rights or possessions. *Carleton* v. *Redington*, 1 Foster's Rep. 291, and the cases there cited. Such agreement cannot have the effect of a conveyance of lands, but only of conclusive evidence of the extent of the titles of the respective parties and their grantees. In *Kip* v. *Norton*, 12 Wend. 127, Mr. Chief Justice *Savage* says: " There can be no doubt that an express parol agreement to settle a disputed and unsettled line is valid, if executed immediately, and possession accompanies and follows such agreement; not that the title to the land passes by the parol agreement, but the party making the agreement is not permitted to bring an action in violation of it. The agreement does not pass the title, but fixes the location where the estate of each is supposed to exist. So, also, where there has been no express agreement, long acquiescence by one in the line assumed by the other, is evidence of an agreement."

And so it has been holden in numerous cases in New York, that long acquiescence, by an owner of land, in an erroneous location, will authorize a jury to find an agreement of the parties to a location different from that in the deed, and that such location, thus inferred from such acquiescence, will conclude the parties as to the accuracy of it. *Mc Cormick* v. *Barnum*, 10 Wend. 104; *Jackson* v. *Widger*, 7 Wend. 723; *Dibble* v. *Rogers*, 13 Wend. 536; *Jackson* v. *Freer*, 17 Johns. 29. And the actual establishment of monuments, by agreement of the parties, subsequent to the execution of the deed, will bind them and those who claim under them, although the monuments may vary from the description of the lines in the deed. *Prescott* v. *Hawkins*, 12 N. H. Rep. 27, and cases cited.

We are, therefore, of opinion that the instructions to the

jury were fully justified by the decisions cited, touching the question under consideration, and that the jury were well warranted, upon the facts reported in the case, in arriving at the conclusion involved in their verdict. Upon that finding, it must be understood that the parties interested as owners of the adjacent lands, the boundaries of which were unsettled, by mutual agreement, by parol, fixed and located the same, excluding from the original " pitch " that part which was covered with water; that the boundary line of Watson's tract was fixed by the edge of the water of the pond, as it then was, as a monument or boundary, and although it did not include all the land to which he was entitled by his deed, yet he assented to it, and acquiesced in it for about the period of twenty-four years, during which time his possession was in conformity with the agreement as to the boundary.

Upon this state of facts, and according to the uniform current of the decisions in this State, and the cases referred to as decided in other jurisdictions, and the principles established by them, we think no doubt remains that such an agreement and location, acquiescence and possession, as are shown by the case, furnish conclusive evidence of the correctness of the location and boundary thus established; and we are fully satisfied of the propriety of the instructions given to the jury. There must, therefore, be

*Judgment on the verdict.*